Filed 1/4/22  In re H.R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re H.R., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> B.W., <br><br> Defendant and Appellant. | F083134 <br><br> (Stanislaus Super. Ct. No. JVDP-20-000018) <br><br> **OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Stanislaus County.  Annette Rees, Judge.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Boze, County Counsel, and Maria Elena Ratliff, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant B.W. (Mother) is the mother of the child H.R., who is the subject of a dependency case. Mother challenges the juvenile court's orders issued at a contested selection and implementation hearing that resulted in Mother's parental rights being terminated. Mother contends the juvenile court erred when it failed to apply the beneficial parent-child relationship exception to termination of parental rights. We disagree and affirm the juvenile court's orders.

## FACTS

### *Initial Removal*

On October 4, 2019, El Dorado County Health and Human Services ("El Dorado County") received a suspected child abuse report that H.R. ("the child") had a very low birth weight, and Mother was having suicidal ideation after recently moving to South Lake Tahoe to escape a domestic violence relationship. Mother reported being very fearful after her boyfriend punched her in the stomach while she was pregnant with the child. A plan was made where Mother agreed to a voluntary family reunification case with the child residing in foster care.

The child was able to gain 10 ounces of weight while in foster care, which indicated she was not being fed properly while in Mother's care. On October 22, 2019, Mother informed relatives that she no longer wished to live in South Lake Tahoe or follow the voluntary family reunification program. Mother was taken to the hospital by maternal relatives due to suicidal ideation and cutting herself, and she wished to move back to Modesto to continue the voluntary program. El Dorado County social workers obtained a protective custody warrant based upon their concern for the child's safety and well-being in relation to Mother's untreated mental health issues.

2.

El Dorado County filed an original petition alleging the child was described by Welfare and Institutions Code section 300, subdivision (b)(1).[1]  The petition alleged that the child was at risk of serious physical harm due to her low weight, Mother's untreated mental health issues, and the history of domestic violence between Mother and the child's father, J.R.  At the detention hearing held on October 25, 2019, the El Dorado County Juvenile Court ordered that the child was to remain out of Mother's care, and it set a jurisdiction hearing for November 13, 2019.  Mother had been visiting regularly since the voluntary foster care placement, and supervised visitation was ordered at three times per week.

*Jurisdiction and Disposition*

The jurisdiction hearing was continued and set for contest while El Dorado County social workers had difficulty verifying mother's residence in Stanislaus County.  In November of 2019, Mother checked herself into the hospital and was subject to a section 5250 hold.  The child was placed with paternal grandparents on November 22, 2019, and she adapted well to the new environment.  After her release from the hospital, mother obtained a residence with maternal relatives in Stanislaus County.  Mother began consistently visiting with the child once she was moved to the relative placement in Stanislaus County.

Mother's residence was eventually verified at an address in Modesto, and El Dorado County recommended the matter be transferred to Stanislaus County after the completion of the jurisdiction hearing.  On January 8, 2020, the El Dorado County Juvenile Court sustained an amended petition and transferred the matter to Stanislaus County for a transfer-in hearing.  The juvenile court of the Stanislaus County Superior Court ("the juvenile court") accepted jurisdiction of the case from El Dorado County,

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

ordered visits between the child and parents to be twice per week for one hour each visit, and set a disposition hearing for February 19, 2020.

The Stanislaus County Community Services Agency ("Agency") filed a Disposition Report on February 13, 2020, which recommended that mother be granted family reunification services. Mother had been slow to engage in services with the Agency, and she recently started her supervised visits with the child at twice per week. The child was in good health and being monitored for the possibility that she suffered from a genetic disorder. At the disposition hearing that was ultimately held on February 26, 2020, the juvenile court approved the reunification case plan for services to be provided to Mother. The child's father was denied reunification services due to his whereabouts being unknown.

### *Family Reunification Period*

The agency prepared a report for the six-month status review to be held on August 12, 2020, which recommended continued family reunification services to Mother. As of the filing of the report, Mother had completed two sessions of individual counseling, and she was not recommended mental health services due to her denial of any mental health symptoms or diagnoses. The clinician for Mother's parenting program indicated that she had not been attending any parenting groups. Mother engaged with a domestic violence counseling program, but she and the child's father continued to have unhealthy communication through social media.

Due to the COVID-19 national emergency, Mother's twice per week visits were conducted via Zoom with one in-person visit each month beginning in June of 2020. Mother had attended a majority of her visits, but she missed several due to illness and technological difficulties. Mother interacted appropriately during the in-person visits by engaging with toys, songs, and positive talk. However, she had unrealistic expectations for her child to participate in Zoom visits without the care provider present, and she failed to use age-appropriate parenting skills at times.

The juvenile court adopted the Agency's recommendations at the six-month review hearing by continuing Mother's reunification services and ordering Mother to complete a psychological evaluation.

The report prepared for the 12-month review hearing recommended that Mother's reunification services be terminated, and a section 366.26 hearing be set. The child remained placed with her paternal grandparents, who were granted de facto parent status in June of 2020. Genetic testing results confirmed the child's diagnosis of the same genetic disorder as Mother.

The report noted Mother's failure to regularly attend her domestic violence program and follow through with a restraining order against the child's father. She had attended 10 individual counseling sessions and continued to participate in parenting groups. Mother reported she was not taking her prescribed psychotropic medications and that she did not want to take medication. The psychologist conducting Mother's psychological evaluation rendered a diagnosis of Personality Disorder, NOS with Narcissistic and Histrionic features, Dysthymic Disorder, and seizure disorder. The psychologist also opined that additional time and services would not allow mother to adequately care for the child.

Supervised visitations continued twice per week via phone or Zoom with two visits each month in person. Mother continued to struggle with having unrealistic expectations of the child's participation in Zoom visits, and she appeared to fall asleep during one Zoom visit. At an in-person visit in September of 2020, Mother told the child not to hit or bite her despite staff noting that the child was not doing any of those things. The child had to be redirected back to her Mother at times, and she showed no distress at the visit's end.

After multiple continuances, a contested 12-month review hearing was held on January 22, 2021. By the time of the contested hearing, Mother had attended only six domestic violence sessions, and her response to recent sessions was described as

"dismissive and passive." Mother testified that she had completed her parenting classes, and she recently moved into the home of a friend in Merced County. The friend acknowledged that Mother began living with her in November of 2020, and she explained how Mother was involved in the activities of the friend's family. On January 27, 2021, the juvenile court provided its ruling by terminating Mother's reunification services and setting a section 366.26 hearing for May 19, 2021.

### Section 366.26 Hearing

The section 366.26 report, filed by the Agency on April 27, 2021, recommended that the juvenile court terminate Mother's parental rights and order a permanent plan of adoption for the child. The child remained in the home of the paternal grandparents, who had been her care providers for the last 18 months and were committed to a plan of adoption. As her prospective adoptive parents, they developed a strong, committed, and loving bond with the child, who effortlessly responded in kind. The child constantly sought out the paternal grandparents and was thriving in their care. The paternal grandparents would use their judgment to determine if any post-adoption contact was in the child's best interest.

Mother visited regularly and appropriately during her monthly supervised visits after the termination of her reunification services. The child cried at various times during visits, and she went willingly with the visitation supervisor at the end of visits. Mother was noted as having limited interaction with the child and texting on her cell phone during a February 2021 visit.

Mother's counsel filed a section 388 petition requesting additional reunification services on May 12, 2021. It was alleged that Mother was living with a new family, taking care of multiple children, and engaging in domestic violence courses and "AA services". The juvenile court denied the section 388 petition without an evidentiary hearing on June 8, 2021.

6.

At the contested section 366.26 hearing held on June 29, 2021, Mother testified about her relationship with the child. She testified that her bond with her daughter was "out of this world," and she sang songs and played during visits. Mother believed she had unique information and coping techniques for her daughter because they both had the same genetic disorder. Mother's counsel argued that the beneficial parent-child relationship exception to adoption applied. Both counsel for the agency and child argued that the child was adoptable, and no exceptions were applicable.

The juvenile court found the child was likely to be adopted and analyzed the beneficial parent-child relationship exception to adoption utilizing the standard set forth in the California Supreme Court's recent opinion in *In re Caden C.* (2021) 11 Cal.5th 614. As to the first prong of the test, the juvenile court found Mother regularly and consistently visited with the child. Mother's interactions with the child were compared to a "positive play date." However, the juvenile court did not believe that the evidence established a significant relationship that was a benefit to the child under the second prong of the test. Furthermore, it determined that any relationship maintained by the Mother did not "rise to the level that termination of that relationship would go against the security and stability of her existing home."

The juvenile court ultimately concluded that Mother failed to establish "by a preponderance of the evidence that termination would be detrimental to the child from the child's point of view." The parental rights of Mother and the child's father were terminated, and a plan of adoption was selected. Mother filed a timely notice of appeal on August 3, 2021.

## DISCUSSION

Mother contends the juvenile court erred when it did not apply the beneficial parent-child relationship exception to adoption. She argues the "love and dedication" she displayed for her daughter was apparent and the juvenile court's finding that she did not

have a substantial, positive, emotional attachment with her daughter was not supported by substantial evidence.

## I.     Legal Principles

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies.  (§ 366.26, subd. (c)(1).)  One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (*Id.*, subd. (c)(1)(B)(i).)

A beneficial relationship is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  "To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed.  [Citations.]"  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)  While a child may derive enjoyment from "pleasant and cordial … visits" with a parent, that is not the type of benefit contemplated by the statute.  (*In re Brian R.* (1991) 2 Cal.App.4th 904, 924.)

A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies.  (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)  Thus, the parent must prove three elements in order to prevail under the beneficial relationship exception: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the

termination of parental rights would be *detrimental* to the child." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 631.)

The first element of the beneficial relationship determination asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.) The focus is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact. (*Ibid.*)

The second element of the exception asks whether the child would benefit from continuing the relationship. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 629.) The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Id.* at p. 632, quoting *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. [Citations.]" (*In re Caden* C., *supra*, at p. 632.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship – in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citation.]" (*In re Caden C.*, *supra*, 11 Cal.5th at p. 633.) Potential negative effects from severance of the relationship might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Ibid.*) While an adoptive home might provide a new source of stability that alleviates emotional stability and preoccupation leading to those problems, making the loss "not, at least on balance, detrimental." (*Ibid.*) Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship

outweighs 'the security and the sense of belonging a new family would confer.' [Citation.]" (*Ibid.*)

## II. Standard of Review

Appellate courts review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id.* at pp. 639–640.) The juvenile court's decision as to the third element – whether termination of parental rights would be detrimental to the child – is reviewed for an abuse of discretion. (*Id.* at p. 640.) When applying the abuse of discretion standard, "[t]he trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.)

The standard of review of a court's determination that a parent did not meet his or her burden to prove an exception to termination of parental rights, is "whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) Specifically, the question is "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*Ibid.*)

## III. Analysis

In the present case, the juvenile court determined that Mother did not meet her burden of proof by a preponderance of the evidence as to the application of the beneficial parent-child relationship exception. The parties acknowledge the juvenile court's finding that Mother visited regularly and generally had positive visits as evidenced by the social worker's reports and Mother's testimony. However, the juvenile court did not find that

there was sufficient evidence of a substantial, positive relationship or that any such relationship outweighed the benefits of adoption to establish the exception.

Based on the present record, we cannot find that the evidence compels a contrary finding as a matter of law. Mother's own self-serving testimony that she had an "out of this world" bond with her child and interacted positively with her child was not uncontradicted evidence of such character and weight to leave no room for a judicial determination that it was insufficient to support the finding of a beneficial relationship. (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1527; see also *In re G.B.* (2014) 227 Cal.App.4th 1147, 1166 [" ' "it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement" ' "].)

Mother's assertion that she and the child "shared a sufficiently substantial, positive, emotional attachment" to trigger the exception with citation to the case of *In re S.B.* (2008) 164 Cal.App.4th 289 is unavailing. In the case of *S.B.*, the juvenile court had found the parent and child had "an emotionally significant relationship." (*Id.* at p. 296.) A bonding study had also been conducted where the clinician opined there was potential harm to S.B. if the parent-child relationship was severed. (*Ibid.*)

The juvenile court recognized that the child would benefit from continuing her relationship with the parent, but it terminated parental rights in part because the child's grandparents would allow her relationship with her biological parent to continue. (*In re S.B., supra,* 164 Cal.App.4th at p. 300.) The appellate court determined from the record before it that the "only reasonable inference" was the child would be greatly harmed by the loss of the relationship with her parent. (*Id.* at pp. 300–301.) This reasoning was based on the record showing that the child "loved her father, wanted their relationship to continue and derived some measure of benefit from his visits." (*Ibid.*) Therefore, it concluded that the juvenile court erred when it found the beneficial parent-child relationship exception did not apply. (*Id.* at p. 301.)

It cannot be overstated that, in the present case, the child was removed from Mother's custody six weeks after her birth, and the relative care providers were the only stable home she knew in less than two years of life. During that time, the relative care providers developed a strong, committed, and loving bond with the child.  In considering the child's very young age of 22 months, a total of six weeks spent in mother's custody, brief and friendly supervised visits throughout the case, and the child's needs for permanency and stability as a toddler, there was certainly room for the juvenile court to determine that a beneficial relationship was lacking in this case.  (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.)

Finally, even if we accept that Mother had established the second prong of the exception, the juvenile court acted well within its discretion when it found the child would not suffer detriment upon termination of the parent-child relationship.  Mother claims that the "potential detriment she may incur – if parental rights are terminated – is hard to quantify" and the child "may 'be greatly harmed' by the termination of parental rights."  These arguments are all speculative, and her assertion that this is one of those "rare cases" where the benefits of adoption are outweighed by a beneficial relationship lacks merit.

Evidence that the child had pleasant visits with Mother is not enough to preserve parental rights.  (See *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 ["The parent must do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant"].)  The child needs permanency and stability in a safe and loving home, which the relative care providers are able and willing to provide.  Mother's limited relationship with the child is not that extraordinary case where preservation of parental rights outweighs the preference for adoption.  (*In re G.B.*, *supra*, 227 Cal.App.4th at p. 1166.)

We conclude that the juvenile court's determination that the benefits of adoption outweighed any benefit to maintaining the parent-child relationship was not an abuse of

discretion.  (*In re E.T.* (2018) 31 Cal.App.5th 68, 76.)  Therefore, the juvenile court did not err in declining to apply the beneficial parent-child relationship exception, and its ordering terminating Mother's parental rights was proper.

## DISPOSITION

The juvenile court's orders are affirmed.


POOCHIGIAN, J.

WE CONCUR:


LEVY, ACTING P. J.


MEEHAN, J.